## F. SHRECK v. ADELA SHRECK.

1—The marriage contract, being *sui generis*, may be regarded as an exception to the general principle that in judicial action on contracts the *lex loci contractus* will prevail.

2—A citizen of Mexico, domiciled in Mexico, married in Texas a woman whose birth-place and ante-nuptial domicile were in Texas. Immediately upon the marriage the parties took up their residence at the husband's domicile in Mexico. Some two years afterwards the wife returned to her father's residence in Cameron county, Texas, and there instituted suit for divorce against her husband, alleging excesses, cruel treatment, etc., while they cohabited in Mexico. The husband appeared and defended the suit. *Held,* that the Texas court had jurisdiction, and that on the finding of the jury that the allegations of the petition were true, there was no error in decreeing the divorce, notwithstanding that the same causes might not have sustained an action for divorce in a Mexican court;

3—Excesses, cruel treatment, and outrages of such character as to affect the wife directly and personally, either in mind or body, fall within the scope and purpose of our statute ; and when so aggravated as to render cohabitation insupportable, are such causes as are intended by the statute to be relieved against by decree of divorce.

Appeal from Cameron.   Tried below before the Hon. E. Basse.

Suit for divorce, brought on March 13, 1869, by the appellee against her husband, the appellant.

In her original petition the plaintiff stated that she was married to the defendant on the 29th of November, 1865, in the county of Cameron, State of Texas.   That since the marriage he had, on different occasions, absented himself from home, taking up his abode at hotels for days and nights in succession, and leaving petitioner destitute of means of subsistence ; that he forcibly took her jewelry and sold it, applying its proceeds to his own use ; that he repeatedly and publicly, as well as privately, called her a Mexican whore, and declared that he wanted nothing to do with her, as she was the whore of a Mexican ; that he was an habitual drunkard, and time after time had driven her from their house by threats and violence, compelling her to seek shelter with friends.

August 27th, 1869, the defendant filed a general demurrer to the petition, and a general denial of its allegations.

September 4th, 1869, plaintiff amended her petition, and alleged that on the 21st of July, 1867, she gave birth to a child, and that she was totally neglected by the defendant during her confinement ; that he not only failed to provide her with a nurse and necessary medical attendance, but that when her mother came to her assistance, she was driven away by the insulting and outrageous conduct of the defendant, and on the next day a sister of the petitioner, who had then come to take care of her, was insulted by him and ordered to leave the house.   That petitioner was continually threatened, abused and maltreated by him from the early part of June, 1867, to the 11th of February, 1868; during which time he would get

after her with a whip, and threaten to whip her to death if she
would not agree with him in his "mal-appreciation" of her
father and mother; which she would never do, as they had
been good parents to her.   That at table, on sundry occasions,.
he threw cups of coffee or tea at her head; and that his treat-
ment of her becoming insupportable, she was driven by it from
his house on the 11th of February, 1868, and compelled to
take refuge with her father, (with whom she had since re-
mained), keeping her infant child, but receiving nothing what-
ever from the defendant towards their support.

No ruling on the demurrer appears in the transcript.

The following review of the evidence is taken from the brief
filed for the appellee, and is a fair statement, omitting imma-
terial details:

One of the principal allegations of the original petition is
that the defendant, upon different occasions, absented himself
from home, leaving plaintiff no subsistence, so that she was
compelled to pawn her wearing jewelry to obtain subsistence.
Salvos Torres, a witness for plaintiff, states that about the time
of the chavasco, October, 1867, Mrs. Shreck gave him her gold
ring to pawn for four bits to get something to eat; that he did
pawn the ring for four bits and took the money to her; she
told him she wanted the four bits for that day.   Another time
he lent her one dollar to redeem the ring, and that he went to
get provisions after pawning the ring.   This testimony very
plainly establishes the allegation as to one occasion upon which
her wearing jewelry was pawned for a pittance to obtain food
for herself.

Another allegation is that he absented himself and limited
plaintiff to the expenditure of twenty-five cents per day for
her subsistence.

The witness, Henry Shreck, nephew of defendant, states that
he gave plaintiff one dollar per day for subsistence; supposed
it was spent for the family; did not know whether any part of
it was paid for servants.   This was done during the absence of
defendant, and by his order.

Another material allegation of the petition is, that defendant had driven plaintiff from her house on three occasions by threats and violence, and that she had been compelled to seek shelter with her friends.

Mrs. Chano, mother of plaintiff, says that she did hope that Shreck and his wife would live together in peace, until the third time that he caused her, by his ill-treatment, to leave him and his house and come home to her parents.

Passing to the amended petition, the first of its material allegations are, that during her confinement in childbed defendant neglected and abused her; failed to provide a nurse and medical attention for her; insulted and drove her mother off when she came to the assistance of plaintiff, and made her leave the house; and when her sister Louisa was sent to take care of her, she was also insulted and abused, and ordered by defendant to leave the house, and never again cross the threshold of his premises.

These important allegations are all proved. Mrs. Chano says: About the time of Mrs. Shreck's confinement she was very much neglected; that she went to see her daughter on the day of her confinement; went to the kitchen and made broth for her, which she needed and had not had. Witness was slighted and insulted by defendant, which caused her to leave. At plaintiff's urgent request she allowed her sister Louisa to go to see her, nurse her, etc. She was also insulted and ordered to leave the house, and told never to return again, nor for her mother to do so either.

Mrs. Longorio says Mrs. Shreck was washing and ironing eight days after her child was born; fifteen days after, swept the house, because Mr. S. would not permit the servants to do it.

Mrs. Sander testifies that Mr. S. was very rude to his wife's sister, Louisa, during her confinement, telling Louisa never again to come to his house under any pretext whatever, nor for her mother to do so either. All this in presence of witness.

Mrs. Miller testifies to the same facts.

Another allegation of the amended petition is, that defendant got after plaintiff with a whip, ran her over the house, etc.

Mrs. Longorio testified that Schreck menaced her with a whip, causing her to leave his presence, and the statement leaves the inference very strong that if she had not left he would have assaulted her with it.

This witness also proves that on two occasions he raised a chair as if to strike her, but did not, as she got out of his way. Periz testifies as to one of these occasions.

Another, and the last specific charge of the amended petition is, that on one occasion at the table he threw a cup filled with coffee at the head of plaintiff. This fact is fully proved by Mrs. Longorio, who states it almost in the words of the petition.

The jury returned a verdict that the allegations of the petition were true.

Defendant moved for a new trial, which was refused, and he appealed from the decree of the court below, dissolving the bonds of matrimony.

*Ballinger, Jack & Mott,* for appellant.—We think the seventh assignment of errors well taken. There was a demurrer to the petition, which was overruled. After hearing the testimony, the court below should have dismissed the cause for want of jurisdiction.

The petition alleges the defendant to be a resident of Matamoros, Mexico.

The appellee's mother, Mrs. Chano, testified that appellant had a good, comfortable house in Matamoros, in which he and his wife lived; that his house and place of business was in Matomoros; and that witness resided in Brownsville, Texas.

On the 11th of February, 1868, appellee left her husband's home and went to her parents in Brownsville, and filed her petition in the District Court of Cameron county, March 13th, 1869.

There was no citation, and the defendant entered appearance by general demurrer and general answer. Why this was done

is not explained, and unless it was to avoid the expense
of service by publication and the delay attendant thereon, we
are at a loss to assign a reason.  But it is very clear that the
parties could not give jurisdiction by consent, and unless the
court had jurisdiction over the subject matter, and over the
defendant, his appearance would not give it.

The testimony discloses the fact that the appellant was, and
is, a resident of the Republic of Mexico, and the presumption
is thereby raised that he is a citizen also.  There is nothing
going to show that he ever was a resident or citizen of Texas,
or of the United States.  He married his wife at the residence
of her parents in Brownsville, and took her to his home in
Matamoros, Mexico, where she lived with him up to the time
of her leaving him in February, 1868.  They were married in
November, 1865.

All of the acts complained of by the petition were alleged
to have been committed at the house of appellant (which was
in Mexico), and all the acts proved were done in his house in
Mexico.  In other words, he was a resident of Mexico, living
with his wife therein, under the jurisdiction of and subject to
the laws thereof.

The parties and the subject matter of the dispute were under
the jurisdiction of the courts of Mexico, and the courts of this
country could take no cognizance thereof.  Merely because she
leaves her husband and comes over into Texas does not entitle
her to lug him and his affairs into American courts.  As well
might the court of Cameron county, Texas, attempt to try a
man for a murder committed in Matamoros.  Her rights must
be tested by the laws of the country where she was living, and
where their violation was alleged to have been committed.

On other questions, counsel cited Shannan v. Shannan, 18
Tex., 521; Taylor v. Taylor, 18 Tex., 574; Wright v. Wright,
3 Tex., 184.

*A. H. Willie,* for appellee.—The material allegations having
been proved, let us inquire: Do they amount to the excesses,

cruel treatment, etc., contemplated by our statute of divorces?

Law writers have found it difficult to define correctly the nature of that cruel treatment which is good cause for divorce. Mr. Bishop, the ablest commentator upon this branch of the law, has made three attempts at such definition, with two of which, at least, he is not entirely satisfied. His first, which is the one quoted by appellant's counsel, he says is not correct. (See Bishop on Marriage and Divorce, 4th ed., §§ 715, 716.) His second varies from this in that it makes the apprehension of bodily harm sufficient if it causes a material interference with the discharge of marital duty. (Id., § 715.) His third, with which he is better pleased, though not entirely satisfied, makes the apprehension sufficient if it be of danger to physical comfort. (Id., § 717.)

For the purposes of the present case, we can, on the part of the appellee, admit the correctness of either of these definitions, and rely upon the authorities from which they are derived; for the excesses complained of and proved, are certainly such as would raise in the mind of a woman an apprehension that further cohabitation with such a husband would be attended with bodily harm; such, too, as would interfere with the discharge of marital duty, with comfort, etc.

But to place the question beyond the possibility of a doubt, we would impress upon the court that the law from which these definitions are derived, is not the law which governs the present case. It is the ecclesiastical law of England upon which they are based, and this law makes *saentia*, or cruelty, a good cause of divorce from bed and board. The judges and doctors of that law have confined the meaning of this cruelty to something that creates an apprehension of danger to the body or to physical comfort. Such, too, is the rule of decision in those States of the American Union where the requirements of the civil or ecclesiastical law have been substantially requoted. But the rule of decision in Texas must conform to our own statute, which is in its terms much broader and more

comprehensive than the civil law and the statutes of most of the other States on this subject. Our statute declares that "a divorce from the bonds of matrimony may be obtained where either the husband or wife is guilty of excesses, cruel treatment, or outrages towards the other, if such ill treatment is of such a nature as to render their living together insupportable." Now, whilst it is perfectly obvious that cruelty which raises a constant apprehension of bodily harm would render marital cohabitation insupportable, and hence a divorce may be granted in our State on causes deemed sufficient by the civil law, our statute is not restricted to such causes alone. Injuries to the affections, the sensibilities, the finer feelings of the heart, or conduct which raises a continual fear of such injuries, are far more likely to render the married state insupportable than mere outrages upon physical comfort. Torture of the mind, constant wounding of the feelings, trampling upon the affections, are far more insupportable than any mere apprehension of a wound to the person.

Mr. Bishop, himself, contends that, upon principle, such outrages, of a mental character, should be held good cause for divorce. He says: "The woman whose soul was wrung for evermore with mental anguish by the hands of her husband, can not, whatever she may desire, discharge to him well the duties of a wife. And if she can not, then nature demands her freedom from the obligation to do the imposssible thing." (§ 725.)

Again: "As a matter of correct legal principle, aside from special adjudication, the apprehended harm need not be bodily harm, but may be mental." (§ 731.)

It was in part to throw off this restriction of cruelty to bodily harm alone, and in part to leave it to the discretion of courts and juries, without reference to the confined rulings of the civil law, to determine what ill treatment should entitle a party to a divorce, that our statute was enacted in the terms which it bears.

In all this we are fully borne out by the decisions of our own Supreme Court, as well as by those of other States, which

have statutes similar to our own. (See Soume v. Soume, 9 La.,. 452, 456; Sheffield v. Sheffield, 3 Tex., 79; Byrne v. Byrne, Id., 340; Wright v. Wright, 6 Tex., 3; Nogees v. Nogees, 7. Tex., 538.)

In Louisiana, where the statute as to ill-treatment is identical with our own, except that the divorce is *a mensa et theoro*,. it was held in the first case above cited that a series of studied. vexations and provocations, without ever resorting to personal violence, might constitute that degree of cruel treatment which. would form a just ground of separation; and Chief Justice Hemphill adopted this as the correct law under our own statute, in Sheffield v. Sheffield, 3 Tex., 79, 87.

At page 84 he says the decisions of the ecclesiastical law and of such States (as Massachusetts, for instance, which follows the ecclesiastical law in this respect,) are not altogether applicable to our statute of divorce.

The case of Shannan v. Shannan, 18 Tex., 521, so much relied on in the brief of appellant's counsel, does not conflict in the least with the above view, but is one of the best authorities in favor of our position. That case was decided long previous to the publication of the edition of Mr. Bishop's work, from which we have quoted, and previous to the two modifications made in his definition of cruelty. So that the mere allusion of the learned judge to Mr. Bishop's first definition does not make it the law in this State. Moreover, none of the facts which Judge Hemphill states, by way of example, as amounting to good cause of divorce, are physical injuries or such as would raise an apprehension of bodily harm. They are all mental injuries, and it should also be noted that some of them had, by the same court, been held to be good cause of divorce. (Wright v. Wright, 6 Tex. R., 3.)

The purport of the decision in Shannan v. Shannan, in the language of the judge who gave it, is that the acts committed must be a direct outrage on the feelings, and such as are inconsistent with the matrimonial relation, its obligations, its duties or affections. (See also 6 Tex., 17.)

LINDSAY, J.—This was a suit for divorce, brought by the wife against the husband, for such alleged excesses, cruel treatment, and outrages, all combined, as to render the continuance of the matrimonial relation insupportable. The parties were married in the city of Brownsville, in the State of Texas, and immediately established their domicile in the city of Matamoros, in the republic of Mexico. Because of the imputed wrongs and injuries, the wife returned to the house of her parents in Brownsville, and there instituted her suit. The divorce was decreed by the District Court of Cameron county, the jury finding, under the charge of the judge, all the material allegations in the plaintiff's petition to be true.

Three grounds are mainly relied upon by the appellant to show the invalidity of the decree, and for which its reversal is asked. 1. The want of jurisdiction in the court pronouncing it. 2. The insufficiency of the evidence to establish the existence of the statutory causes relied upon to warrant it. 3. The improper charge of the court, which, it is supposed, might have mislead the jury, and superinduced a false finding.

1. It is certainly a general principle, that, in judicial action upon contracts, the law of the place where the contract was made governs in determining its construction, obligation and enforcement, its validity or invalidity, unless it be in express conflict with the law of the forum; or unless it was entered into to be performed in another country. This principle is a general one, though not of universal application. The contract of marriage being *sui generis*, may be regarded as an exception to the universality of the rule; as also such contracts as are against the interests of morality and religion, which each independent municipal authority must judge of and determine according to its convictions of what will best promote its own social happiness and welfare. In this case the marriage contract was entered into in the State of Texas, but with a view to the fulfillment of its obligations and the discharge of its duties in the republic of Mexico, the domicile of the husband. The principle is equally well recognized that the domicile of the

husband is the domicile of the wife, and the same causes for
divorce may not exist in Mexico as do exist in Texas.

In our peculiar system of an intercommunion of States, the
doctrine seems to be well established that the law of the place
of the actual *bona fide* domicile of the parties gives jurisdic-
tion to decree a divorce for any cause allowed by the local law,
irrespective of the law of the place of the marriage, or of the
place of the violation of the obligations of that civil relation.
But there is no such intercommunion between the States of
Mexico and Texas.   And even in the American States it is said
by Justice Story, in his Conflict of Laws, that "what would
be the effect of a marriage in Connecticut, a subsequent *bona
fide* change of domicile to New York, and then a divorce in
Connecticut, both parties appearing in the suit, remains as yet
undecided."   Nor has this court been able to find a case, deter-
mined in any American court, since this annunciation by the
learned commentator.   It is the precise point presented for
determination by this record, with the simple variance in the
relations of Mexico and Texas, and of the several American
States among themselves.   In all Christian Protestant coun-
tries, however, a marriage contract, according to the laws of
one State, is held valid in every other.   But the right, the
duty, and the obligation of every State to guard and protect
the interest of its own morality and religion, will warrant it
upon the principles of natural justice, while acknowledging
the validity of the contract formed in other jurisdictions, to
relieve its own citizens from its obligation, when the causes
prescribed by its authority to work its dissolution are made
manifest in its own tribunals.   The wife was a citizen of Texas
at the time of her marriage.   The contract was made in Texas.
When aggrieved beyond the measure of civil endurance, she
sought an asylum in the government under which she was
born, changed her domicile, and renewed her suspended alle-
giance, that she might find protection against injury and
wrong.   Unless there was some development that this was
done collusively, and in fraud of the law; if the causes

charged did actually exist, the relief and protection ought to have been extended, and the jurisdiction of the court attached to the cause, and was acquired by the appearance of the husband in defense.

2. The court does not deem it necessary to enter into any special commentary upon the evidence adduced to show the existence of the statutory causes for the divorce. It is enough to say if the excesses, cruel treatment and outrages affected the wife, directly and personally, in mind or body, they fall within the scope and purpose of the statute, and are such causes as were intended to be relieved against by granting a divorce. As long as the husband is kind and gentle, generous, tender and affectionate towards his wife, whatever he may be to others, and however ignominious and degraded he may be in the estimation of others, it is the policy of the law and the true interest of society that no toleration should be given to the dissolution of the connection. He may be a corsair, a brigand, the vilest of the vile, yet if he treats the wife of his bosom with gentleness, with kindness, with affection, he is "not guilty of the excesses, the cruel treatment, or outrages" contemplated by the statute. This excess, cruel treatment and outrage must affect the wife directly and personally, and not mediately or remotely. Unless she is so affected, in body or in spirit, duty enjoins forbearance and submission, and the fostering of the sentiment expressed in the distich of the poet :

> " I know not, I ask not, if guilt's in that heart,
> I but know that I love thee, whatever thou art."

The mutual cultivation and encouragement of this sentiment by both parties, when the marriage relation is once established, would effectually obviate all domestic broils, and dispense with the designation of any causes for divorce by the law-giver. But, as this Arcadian devotion seems unattainable in the general depravity of the age, the whips and scourges of the law must be applied to the unruly passions of mankind, in order to shield and protect the weak and the innocent from the brutality of the wicked and the depraved. The view of the law taken

by this court in the case of Shannan v. Shannan, 18 Texas, is in harmony with the opinion here expressed.

3. No error is perceived in the charge of the court, which could by possibility mislead the jury. It is true, the first paragraph in the charge would have been sufficient. But the additional charge was a correct statement of the law, (if the facts alleged were true, of which the jury were the triers,) and was a guide to the court rather than to the jury. If it was merely the annunciation of an abstract principle of law, this court can not see how it could vitiate the finding of the jury, that the "material facts alleged in the petition were true." The demurrer to the petition was properly overruled, because the material allegations in it brought the case within the provisions of the statute. Whether or not those allegations were established by the evidence, was for the jury to determine. And from the decision of this court in the case of Taylor v. Taylor, 18 Texas, in which a decree for divorce was made upon testimony much more slight, the evidence in this case was ample to sustain the verdict.

The judgment of the court is affirmed.

Affirmed.